IRVING, J.,
for the Court:
¶ 1. This action arises out of an incident that occurred on February 28, 1995, wherein Stanley Harried suffered severe and permanent injuries from electrical burns to his body when he came into contact with an electrical wire owned by Southwest Mississippi Electric Power As *367 sociation. The trial testimony was in direct conflict on the factual question of how Harried’s injuries occurred. Both sides introduced lay witnesses and expert witnesses. The outcome of the trial was a jury verdict in favor of Harried in the sum of $700,000 and in favor of his wife, Annie Wilson Harried, on her loss of consortium claim in the sum of $300,000.
112. Feeling aggrieved, Southwest Mississippi Power Electric Association (Southwest) filed this appeal with the following statement of issues, quoted verbatim from its brief:
1. WAS STANLEY HARRIED’S TESTIMONY SO CONTRARY TO PHYSICAL FACTS AND THE LAWS OF ELECTRICITY THAT THE ONLY REASONABLE CONCLUSION IS THAT HE BURNED HIMSELF WHILE UP ON A POLE STEALING WIRE?
2. IN THE ALTERNATIVE, WAS THE VERDICT IN FAVOR OF STANLEY HARRIED AND HIS WIFE AGAINST THE SUBSTANTIAL WEIGHT OF THE EVIDENCE?
3. WERE SOUTHWEST POWER’S RIGHTS TO A FAIR TRIAL IM-PERMISSIBLY PREJUDICED WHEN PLAINTIFFS’ COUNSEL GRATUITOUSLY MADE A WITNESS OUT OF THE COURT BAILIFF, HIS PERSONAL CLIENT, AND THE BAILIFF BOTH SERVED AS BAILIFF AT THE OPENING OF THE TRIAL AND TESTIFIED IN UNIFORM FOR THE PLAINTIFF, ALL IN THE FACE OF A PRIOR COURT RULING PROHIBITING ANY WITNESS FROM SERVING AS BAILIFF?
4. WAS PLAINTIFFS’ COUNSEL’S DESCRIPTION OF HEARSAY EVIDENCE IN HIS OPENING STATEMENT A GROUND FOR THE CIRCUIT COURT TO ADMIT THAT HEARSAY AT TRIAL, WHERE THE HEARSAY WAS OFFERED TO ARGUE A THIRD PARTY DECLARANT TRUTHFULLY INTENDED TO AND SUBSEQUENTLY DID PERSUADE DEFENSE WITNESS JIMMY WILLIAMS TO FABRICATE TESTIMONY?
5. WERE STATEMENTS ON THE DAY OF THE ACCIDENT THAT STANLEY HARRIED WAS HURT CUTTING WIRE, MADE BY PEOPLE WHOM THE JURY COULD HAVE BELIEVED GOT THEIR INFORMATION FROM JIMMY WILLIAMS, ADMISSIBLE IRRESPECTIVE OF TRUTH TO REBUT THE ALLEGATION OF LATER FABRICATION BY WILLIAMS, AND WAS ANNIE HARRIED’S STATEMENT THAT DAY THAT STANLEY WAS CUTTING WIRE A PARTY ADMISSION, EVEN THOUGH SHE DID NOT PERSONALLY WITNESS THE ACCIDENT?
6. IN LIGHT OF M.R.E. 608, WHICH ALLOWS THE EXPRESSION OF AN OPINION CONCERNING A WITNESS’ CHARACTER FOR TRUTHFULNESS BUT FORBIDS ADMISSION OF EITHER EXTRINSIC FACTS OR OPINIONS ON OTHER CHARACTER TRAITS, DID THE CIRCUIT COURT ERR WHEN IT ALLOWED SHERIFF PETER WALKER TO TESTIFY THAT DEFENSE WITNESS JIMMY WILLIAMS WAS NOT MENTALLY SOUND, HAD BEEN A SPE- - CIAL EDUCATION STUDENT, AND DRANK ON A DAILY BASIS?
7. WHETHER A NEW TRIAL, IF GRANTED, SHOULD BE HELD I) IN A COUNTY OTHER THAN JEFFERSON COUNTY BECAUSE OF THE RISK OF UNFAIR PREJUDICE ARISING *368 OUT OF TESTIMONY BY SHERIFF WALKER AND THE COURT’S CUSTOMARY BAILIFF, AND II) BEFORE A JUDGE WHO DOES NOT HAVE A PROFESSIONAL RELATIONSHIP WITH SHERIFF WALKER AND HAS NOT DECLARED A BELIEF IN HIS HONESTY?
Finding that the evidence, taken in the light most favorable to Harried, will not sustain the verdict, we reverse and render.
Facts
¶ 3. There were only two witnesses to the accident, the appellee Stanley Harried, and his passenger, Jimmy Williams. Each gave different versions as to what happened. We now discuss their accounts of what happened.

Harried’s version

¶ 4. At the trial of this matter Harried testified that on the day of the incident he had driven his vehicle down a narrow gravel road which leads from Mississippi Highway 553 in Jefferson County. Harried claimed that there were two loose wires dangling from an electrical pole along the roadway which were long enough to cross onto the roadway. He testified that he had seen these wires on many occasions lying in the roadway for a period of approximately six months prior to the day of the incident.
¶ 5. Harried testified that he and his passenger, Jimmy Williams, were going to Samuel Ellis’s home which was located at the end of the road. Harried claimed that Ellis had called him the day before and asked Harried to bring him cigarettes. Harried testified that he often carried cigarettes to Ellis.[1] Harried went on to testify that as he drove down the gravel road, the two electrical wires that were lying in the roadway became lodged underneath his car on a wire clothes hanger that had been placed around the car’s catalytic converter to hold it in place. Harried stated that he exited the driver’s side of the car and went around to the passenger’s side where the electrical wires were lodged. He stated that he assumed the wires were dead. He testified that he crouched down, placed his left hand on the ground on top of one of the wires, and with the wires between his legs, used his right hand to pull on the wires in an attempt to dislodge them. It was his testimony that the dead wire dangling from the top position on the pole was looped over the top of the pole so that it rested near the energized top wire on the other side of the pole and that his pulling on the wires caused the two wires to come into contact with each other causing the dead wire to become energized and sending at least 6,500 volts of electricity into his body.

Williams’s version

¶ 6. Williams suffers from some form of diminished mental capacity as a result of an injury and was described as “slow.” He testified that Harried was injured when Harried climbed the pole with the intention of taking the neutral wire from the pole. The wire was made of copper.[2] He told the story this way. On the day of the incident Harried gave him a ride when Harried saw him walking. Harried told Williams that he was on his way to pick up carpet. Williams said he went along for the ride. Harried drove onto the gravel road, stopped next to the pole, and exited the car. Williams testified that he also exited the vehicle, but that he did so in order to relieve himself. Williams stated that he had his back to Harried while he *369 relieved himself, and when he finished and turned around he saw Harried climbing the pole with the aid of a small cedar tree located near the pole. Harried had a pair of insulated red-handled pliers with him. After Harried climbed the pole, he first touched the bottom wire then climbed a little higher on the pole, straddled the bottom wire and began cutting it with the pliers, but he did not completely cut the wire in two. Harried then reached up with the pliers and touched the top wire. That was when the electricity struck him. Williams testified that when the electricity struck it looked like “blue fire.” According to Williams, Harried held onto the pole for a period of about five minutes before falling to the ground. Williams testified that he put Harried in the car, drove to Harried’s home where they picked up Harried’s wife and then drove to the hospital. Williams denied that the loose wires dangling from the pole were long enough to reach the ground and denied that Harried ever touched either of those wires.
¶ 7. Robert Sanxton was called as a witness by Harried at the trial. He testified that he lived near where the incident occurred and often had occasion to walk down the gravel road, sometimes as often as two or three times a month. It was his testimony that for two to three months prior to the incident he noticed the wires hanging from the pole when he walked down the road. He stated that the wires were long enough to reach across the gravel road. He testified further that some of the time when he walked down the road the wires would be lying in the road and on other occasions they would be lying beside the road. When he was asked how it was that the wires would be lying in the road at times and lying beside the road at other times, he responded that he thought the wind blew them around. He testified that he thought the wires were live but admitted he never reported their downing to the power company. It was also his testimony that after Harried was injured he paid no further attention to the wires and did not know whether they were still down after the incident or not. He testified that he learned of the incident and the location where it occurred from Harried.
¶ 8. E.G. Nations, manager of engineering and operations for Southwest, testified that Southwest employed service people whose job it was to make cursory checks of the lines as they passed through the service area for any downed lines, as well as meter readers who checked every meter except rural impassable or locked gates. He further testified that Southwest received daily reports of downed lines or problems with lines, but that there was never any report from anyone of lines being down on the gravel road where the incident occurred, either before or after the incident. Nations did not hear of the incident involving Harried until the second day after it happened. He stated that Southwest learned that someone had been hurt on a line, but there was no indication that it was even one of Southwest’s lines. He testified that he later contacted Sheriff Walker who, approximately a month or more after the incident, carried him to the location where it was said to have occurred.

Harried’s injuries

¶ 9. Dr. Robert T. Love, Jr. testified that when Harried was admitted to the Mississippi Firefighter Memorial Burn Center the history that Harried provided regarding how the injury occurred was confusing, and the staff at the burn center could not make a whole lot of sense out of how it happened. Dr. Love testified that Harried said that Harried was working in the yard and picked up a live wire. Harried had burns to the tip of his right index finger, his right arm, chest and back, his left hand and arm and a very severe electrical burn in his right groin which went deep into the muscle. A photograph of the groin burn mark shows that it matches the width of the wire Williams said Harried was straddling when the electricity struck him. Dr. Love stated that the burn to Harried’s groin was a “strange” location *370 for an electrical burn. He testified that the entire burn center staff commented on it, particularly the operating room personnel. When the doctor was asked whether the history provided by Harried seemed inconsistent with the injury the doctor responded as follows:
Could you be a little more specific? I mean, if he said he picked up a wire and put it here (indicating) — and I think that’s what he told me — I could see how it was consistent. But I had never seen an electrical injury that high in the groin, and that was the thing that I wondered about.
¶ 10. Questioned further whether the injury would be consistent if Harried was on his knees at the time he was burned, the doctor went on to say:
If he was on his knees? It could — it’s conceivable, I mean, and possible. I don’t know whether its probable. But I just — it’s just higher — it looks like— somebody suggested at one point “Do you think he got it wrapped around him and it is the way it got into the groin? You know, he stumbled into it.” We were just speculating.... But the groin was just — that high in the groin was just a little bit strange.

Harried’s expert and the physical evidence

¶ 11. William W. Adams, a consulting electrical engineer, testified that when he was initially informed of Harried’s injuries he was told that Harried was on his hands and knees, pulling at the wire when he was injured. Adams testified that he was bothered by that explanation because Harried did not have any burns on his knees or his feet. At a later meeting between Adams, Harried, and Harried’s counsel, called at the request of Adams to address this concern, Harried altered his explanation of how the injury occurred and stated that he was squatting or crouching. Adams testified that squatting or crouching would explain the lack of burns to Harried’s knees but would not explain the lack of burns to his feet. Adams testified that Harried then explained that he was wearing thick rubber-soled hunting boots. Adams was not able to say with any amount of certainty that hunting boots would have prevented burns to Harried’s feet under the circumstances described by Harried. When Harried’s wife was questioned about what her husband was wearing when she went with him to the hospital, she referred to his “wet shoes,” but made no mention of hunting boots.
¶ 12. Adams conceded that he had not been able to make any sense out of Harried’s claim that the loose wire looped over the top of the pole and made contact with the live wire on the other side of the pole. Adams agreed that the loose wire, as well as the live wire, were anchored to the pole by heavy double bell insulators, weighing about six pounds each, which did not swing or move about. He also stated that the copper wire itself is stiff and not flexible. He further testified that he examined the loose wire and found no evidence of arcing, or electrical burns on that wire. When Adams was asked why there was no burn, similar to the burn in Harried’s groin, on the palm of Harried’s right hand, which, according to Harried, was holding the loose wire when it became energized, Adams responded that he did not know.

Southwest’s expert and the physical evidence

¶ 13. Francis M. Wells, an electrical engineer, testified as an expert on behalf of Southwest. Wells reviewed the testimony of both Harried and Williams and was asked whether Harried’s description of the accident was consistent with the physical evidence that Wells found at the scene of the incident and the laws of electricity. Wells answered that it was not.
¶ 14. Of the two wires that Harried claimed reached into the road, one was a phase wire, also referred to as a live wire, which had carried electricity at one time but was a dead wire at the time of the incident. The other was a neutral wire. *371 A neutral wire carries current but is grounded. It can be touched without causing an electrical shock unless the person who touches it is also in contact with a live wire. When phase wires and neutral wires are connected to the pole, the phase wire is in the top position on the pole, and the neutral wire is in the lower position.
¶ 15. Wells’s examination of the pole revealed that the neutral wire on the opposite side of the pole was broken. The surface of both ends of the wires where the break occurred appeared to have tool marks on them. One end also had an arc mark that gave the appearance of that end having been melted. Copper -only melts at extremely high temperatures.
¶ 16. Wells explained that Williams’s testimony that Harried continued to hang onto the pole for some length of time after the electricity struck, seems mystifying until one takes into consideration the fact that the neutral wire was broken. It was obvious, according to Wells, that until the neutral wire broke, it held Harried up on the pole. When it broke, he fell. It was Well’s opinion that Williams’s testimony and the surviving physical evidence were absolutely consistent. According to Wells, the location and severity of Harried’s burns were also consistent with Williams’s description of what happened rather than Harried’s version. The burn on the inside of Harried’s thigh indicated that Harried was touching the wire under substantial pressure, as if he were hanging over the wire, just as Williams said. According to Wells, the mere brushing of the wire against Harried’s leg, as Harried claimed, would not have burned Harried that deeply nor would it have left the noticeable burn mark. There would have been a more generalized burn. The arc from the electricity would have moved around more if the wire had not been forced into his flesh.
¶ 17. Further, according to Wells, the pattern of Harried’s other burns were also consistent with Williams’s, and not Harried’s, description of how Harried was injured. Williams said that the electricity struck when Harried reached up with the pliers and touched the phase wire. The only burn to Harried’s right hand was on the tip of his index finger. According to Wells, the nature of this burn indicated that Harried’s index finger may have been touching the metal part of the insulated pliers while the rest of his hand was in touch with the insulated red handle. Wells explained that the nature of electricity is such that one must be in very, very close proximity to the energized source before electricity will establish a path. However, the slightest contact with a live wire will allow electricity to establish a path and begin an arc or flash. The arc which resulted from the pliers coming into contact, with the live wire created a flash across Harried’s body which went through his arm and across the upper right side of his body and into his thigh which was hanging on the neutral wire. According to Wells, this process was enhanced by the fact that Harried, more than likely, was perspiring to some extent so that his skin resistance on the surface was fairly low, making him even more susceptible. Wells explained that the point of contact of Harried’s body with the neutral wire, hi$ inner thigh, was the exit path for the majority of the current that passed through his body. Wells testified that the burn pattern from the tip of Harried’s finger down the inside of his arm and along his chest and back and into his thigh was totally consistent with Williams’s description of what happened and not with Harried’s description.
¶ 18. Harried also had burns to his left hand and a small one to his left forearm. Wells explained that Harried was obviously holding on to other parts of the system on the pole and that part of the current from the phase wire went through his left hand as well as through his left leg where they were both touching the pole.
¶ 19. Wells was asked whether there was anything about the physical evidence and Harried’s injuries that contradicted Harried’s testimony that the wire was caught *372 underneath his ear and that he was injured while trying to dislodge the wire by pulling on it. Wells responded that first of all, there was no evidence at the scene nor any photographic evidence that the loose wires ever reached the ground much less into the road, but that even if they had, there was no way that either of the wires would have ever come into contact with the live phase wire on the pole. According to Wells:
I mean, it’s one of these things that just physically boggles the mind to think that you can take a piece of number 6 copper and push that big bell up and make it make the wire move around until it actually touches the phase wire. It just is incredible to think that that would happen .... I just can’t see that physically being possible.
¶ 20. Wells further testified that there were two things about Harried’s claim that wires became entangled underneath his car which did not coincide with the physical evidence and the laws of electricity. One, he said, was that any time an energized wire becomes entangled with an automobile, invariably the tires on the vehicle are set on fire, the air blows out of the tires, and the automobile drops causing enough current to be drawn to trip a circuit breaker. The other contradiction was Harried’s claim that there were two wires underneath the automobile. If the wires were entangled with each other and one became energized, it would caused the other to become energized as well and, according to Wells, that would draw a “ferocious” current which would cause the circuit breaker to open and eventually lock out and turn the power off. There would be a blackout; someone would have to call the power company to have the power restored. Neither of these things occurred in Harried’s case.
¶21. When questioned about whether Harried’s injuries matched up with Harried’s description of what happened, Wells stated that there were several serious problems with Harried’s version of events. Initially, Harried stated repeatedly that he was on his hands and knees pulling on the wire trying to remove the wire from underneath a tire. Wells explained that if that were true Harried should have had burns on both his hands and knees because it is the nature of electricity to cause serious burns to whatever part of the body is touching the ground. Harried had no such burns. When asked whether heavy soled shoes would have prevented burns to Harried’s feet, Wells responded that they would if they were rated to withstand electricity and had been maintained. However, he went on to explain that ordinary run-of-the-mill boots that are not designed as electrical insulating boots, would not have prevented burns to Harried’s feet.
¶ 22. Wells was also asked whether Harried’s claim — that Harried had been kneeling down with one hand on one wire and pulling at another wire which ran between his legs, back behind his body and up the pole — was consistent with Harried’s injuries. Wells answered that it did not seem possible for that to be true because at that angle the wire would not have been aligned with Harried’s inner thigh in the position matching the burn mark.

Other physical evidence

¶ 23. Carl Byrd, a forensic scientist specializing in firearms and tool mark examination, testified as an expert for Southwest. Byrd testified that he was asked to examine two sections of wire which included each of the severed ends of the broken neutral wire from the pole. He indicated that he was examining the wire for the presence of striations or tool marks in the area where the wire broke. Byrd testified that his examination revealed the presence of microscopic striations on the outer surface of the wires which were consistent with an attempt to cut the wire with some type of tool. He further testified that it was his opinion that the break in the wire did not result from the wire having been completely cut through with a tool but appeared to have broken or given way after having been cut to a limited extent.
*373 Analysis of Issues Presented
¶ 24. Although Southwest sets forth three major assignments of error with each having several sub-assignments, we find one issue to be dispositive and that is the contention that when the evidence is considered in the light most favorable to Harried, reasonable and fairminded jurors could only find for the appellant Southwest Mississippi Electric Power Association. Hence, we find it unnecessary to address the other issues raised by Southwest.
¶ 25. The standard of review for jury verdicts in this state is well established. Once the jury has returned a verdict in a civil case, we are not at liberty to direct that a judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found. Starcher v. Byrne, 687 So.2d 737, 739 (Miss.1997).
¶ 26. When this Court examines the facts in the case at bar in the light most favorable to Harried to determine what conclusions can reasonably be drawn from those facts, we reach the inescapable conclusion that Harried’s injuries could not have occurred the way he testified that they did. As stated, there were two witnesses to the events leading up to Harried’s injuries: Harried himself and Jimmy Williams. Williams has given a version of events that is consistent in almost every regard with the physical evidence and the laws of physics and electricity. Harried, on the other hand, has provided a version of events that defy credulity and contradict the physical evidence and the laws of physics and electricity.
¶ 27. In order for Harried’s injuries to have occurred in the manner described by Harried and his witnesses, one would have to believe: 1) that two electrical wires, long enough to cross a gravel road, lay unreported in a well traveled area for as long as six months; 2) that the position of those wires changed so that they were sometimes in the road and sometimes along side the road; 3) that those wires were seen and observed by passersby, one of whom assumed that the wires were live, who failed to take any action to have the situation remedied, but to the contrary, continued to travel the road as though the wires were not there; 4) that meter readers for the power company traveled past those downed wires for six months and failed to report the situation; 5) that a person of average intelligence would get down on his hands and knees and use his hands to try to disengage tangled electric wires from underneath an automobile; 6) that pulling stiff copper electric wire anchored by two six-pound bell insulators from underneath an automobile could cause the wire to loop over the top of an eighteen-foot electric pole and come into contact with a live wire on the opposite side of the pole; 7) that the then energized wire would cause no burns at all to the palm of the hand holding the energized wire, and yet, cause severe burns to an area of the body not in direct contact with the wire.
¶28. Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938) teaches that if there be any one thing in the administration of law upon which the decisions, the texts, and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence and is not sufficient to sustain a verdict. This is true even in those jurisdictions which still cling to the scintilla of evidence rule, and except in the few jurisdictions wherein the latter rule prevails, the overwhelming weight of authority throughout the country is that believable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case and that bare possibilities are not sufficient. Where evidence is so contrary to the probabilities when weighed in the light of common knowledge, common experience, and common sense that impartial, reasonable *374 minds cannot accept it other than as clearly an improbability, it will not support a verdict. Id.
¶ 29. The person on whom the burden of proof rests to establish the right of a controversy must produce credible evidence from which men of unbiased minds can reasonably decide in his favor. 0Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N.W. 142, 145 (1911). An inherently incredible story is not made credible by being sworn to, nor can it be allowed to serve as the foundation of a verdict. McCarthy v. Bangor & A.R. Co., 112 Me. 1, 90 A. 490, 492 (1914). Courts sire not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible, although there may be evidence tending to support it. Lessig v. Reading Transit & Light Co., 270 Pa. 299, 113 A. 381, 382 (1921) ( quoting from Norfolk & W.R. Co. v. Strickler, 118 Va. 153, 86 S.E. 824 (1915)). The jury will not be warranted in finding the existence of a fact on the positive testimony of a witness which is contrary to conceded facts or matters of common knowledge, or to all reasonable probabilities. Latta v. Fidelity-Phoenix Fire Ins. Co., 186 Wis. 116, 202 N.W. 299, 302 (1925).
¶ 30. Clearly, the evidence supports Williams’s description of how Harried’s injuries occurred, and not Harried’s version of events leading up to his injuries, and based on the totality of the evidence adduced in this case, we are constrained to hold that no reasonable fairminded hypothetical juror could have returned a verdict in favor of Harried. Accordingly, we reverse and render the jury’s verdict.
¶ 31. THE JUDGMENT OF THE JEFFERSON COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED AGAINST THE APPEL-LEES.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.

. Sammy Ellis denied ever requesting or receiving cigarettes from Harried at any time. Ellis also testified that there were loose wires hanging from the pole but stated that they were not long enough to reach the ground and had never been long enough to reach the ground.

. Jefferson County Sheriff Peter Walker testified that the sheriff's department had received reports of copper wire being stolen from electrical poles. He stated that it was something that happened rather frequently.